UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

JOEY HEMINGWAY,

                Defendant.
_____

REPORT & RECOMMENDATION

05-CR-6108L

## BACKGROUND

        By Order dated September 13, 2005, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 10).

        Defendant Joey Hemingway ("Hemingway") is charged in a six-count superseding indictment.  The first count charges that between January 2000 and March 2006, Joey Hemingway and his brother Andre Hemingway conspired to possess with intent to distribute, and to distribute, fifty grams or more of cocaine base and five hundred grams or more of cocaine, in violation of 21 U.S.C. § 846.  The second and third counts charge that on March 28, 2005, Joey and Andre Hemingway possessed with intent to distribute cocaine base and cocaine, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.  The fourth and fifth counts charge that on March 8, 2006, Joey and Andre Hemingway possessed with intent to distribute cocaine base and cocaine, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.  The final count charges that on March 28, 2005, Joey Hemingway illegally possessed a firearm and ammunition after having been convicted of a crime

punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket # 25).

This Court previously issued a Report and Recommendation relating to motions filed by co-defendant Andre Hemingway. (Docket # 96). That recommendation was thereafter adopted by Judge Larimer on February 13, 2007. (Docket # 102).

On November 30, 2006, Joey Hemingway moved to preclude the government from introducing at trial evidence relating to nine separate events that the government had contended is evidence of the charged conspiracy.[1] (Docket # 88). The government now represents that it no longer seeks to admit evidence relating to two of the incidents, specifically, those that occurred on October 19, 1999 and July 19, 2005. (Docket # 109 at 3-5). Of the remaining seven, Hemingway has filed motions to suppress evidence seized during two, and this Court has conducted evidentiary hearings as to those incidents – the first involving events occurring on November 21, 2003, and the second involving events occurring on April 12, 2004.[2] Following the hearings, Hemingway has conceded that no constitutional basis exists to seek suppression of the evidence seized on November 21, 2003,[3] leaving the lawfulness of the

---

[1] Hemingway's omnibus motion relating to the superseding indictment also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, suppression of statements and rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence. (Docket # 47). Each of these requests was either resolved by the parties, decided in open court by the undersigned on June 14, 2006, or subsequently withdrawn by Hemingway. (Docket ## 57, 60, 75).

[2] Hemingway's initial motion papers incorrectly identified the dates of these events as November 11, 2003, and April 27, 2004, respectively. (Docket # 88 at ¶ 57-60).

[3] Specifically, Hemingway has conceded that "the record [does] not establish a basis for suppression of the evidence . . . based on Fourth Amendment violations." (Docket # 122 at 1). Because Hemingway no longer seeks suppression of evidence obtained on November 21, 2003, I recommend denial of his motion to suppress evidence obtained that day.

officers' actions on April 12, 2004 as the only issue currently in dispute.[4]  Accordingly, the April 12, 2004 incident is the only one addressed in this Report and Recommendation.

## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing on January 19 and 24, 2007.  At the hearing, the government offered the testimony of Officers Scott Ferro and Paul Romano of the Rochester Police Department.  Joey Hemingway was called by the defense.  The following is a summary of the relevant testimony elicited during the hearing.

**Testimony Offered by the Government**

On April 12, 2004, at approximately 8:19 p.m., a team of four police cars was patrolling the area of Lewis Street in the City of Rochester – an area of the city with a high incidence of violent and narcotics activity.  (Tr.A 9-10; 35).[5]  As the patrol cars turned onto Lewis Street, Officer Mazurkiewicz, who was traveling in the first car, transmitted a radio broadcast that he had observed an older black male with his head inside a vehicle.  He reported that the male was wearing a dark-colored hooded sweatshirt.  (Tr.A 14; 36).  Officer Ferro, who was driving in the second car, testified that upon hearing the radio report, he too observed a male

---

[4] This Report and Recommendation does not address any evidentiary objections Hemingway may wish to raise to the admissibility of evidence relating to any of the seven incidents.  Those objections are better left to the discretion of the trial judge at the time of trial.

[5] The transcript of the suppression hearing conducted before this Court on January 19, 2007, shall hereinafter be referenced as "Tr.A __."  (Docket # 109).

The transcript of the suppression hearing conducted before this Court on January 24, 2007, shall hereinafter be referenced as "Tr.B __."  (Docket # 111).

matching the description provided by Mazurkiewicz standing near the driver's side of a green Oldsmobile Aurora with his head and right arm inside the vehicle. (Tr.A 12; 14). Officer Romano also saw a male matching Mazurkiewicz's description looking into the Aurora. (Tr.A 36-37). The Aurora was parked in the area of 195 Lewis Street. As the police vehicles continued to approach, the male looked up from the car in the direction of the officers, at which point he "immediately" withdrew his arm from the Oldsmobile, turned and began walking quickly in the opposite direction. (Tr.A 15). Ferro believed that he had witnessed a narcotics transaction. (Tr.A 16).

Mazurkiewicz directed the other officers to "step out" of their vehicles and question the individual. (Tr.A 15). Ferro and his partner, Officer Kevin Schoenl, approached the man as he continued to walk away. Ferro observed him place his right hand, which appeared to be holding something, into the front pocket of his hooded sweatshirt. (Tr. 17; 28-29). Schoenl began to speak with the man and conducted a pat-search of his person, during which Ferro noticed that the man was leaning towards his left side. Ferro directed him to stand up straight. When he did, a clear bag containing a white powder substance fell out of his front sweatshirt pocket. (Tr.A 17-18). Ferro notified the other officers of the discovery of suspected cocaine, and the man, then identified as Charles Walker, was arrested for possession of cocaine. (Tr. 19).

Meanwhile, Officers Romano and Alberto exited their patrol cars and approached the green Aurora, which had two people seated inside. (Tr.A 37-38; 54-55). Romano testified that he recognized the driver of the vehicle, but could not remember his name. After asking for identification, Romano identified the driver as Joey Hemingway. (Tr.A 39-40). Romano asked Hemingway where he was coming from, where he was going and what he was doing. During

this questioning, Romano heard Ferro's announcement that he had discovered cocaine on Walker. (Tr.A 40). As a result of this information, Romano asked Hemingway to step out of the car, which he did, and Romano asked him whether he possessed any weapons or narcotics. (Tr.A 40-41). Hemingway replied that he did not and told Romano to "check" him. (Tr. A 41; 56). Romano conduced a search of Hemingway's person and discovered in the small, right front pants pocket of his jeans (the change pocket) two small baggies containing a substance Romano believed to be cocaine. (Tr.A 42). According to Romano, Hemingway did not resist the search, nor did he ask Romano to stop the search while it was being conducted. (Tr.A 43).

At that point, Hemingway was handcuffed and placed in the rear seat of one of the patrol cars. While seated in the car, Hemingway complained to the officers that his wrists hurt. One of the other officers removed Hemingway from the car and loosened the handcuffs. During this process, a small baggie containing a green leafy substance was discovered in Hemingway's hands. (Tr.A 58; 60).

**Testimony Offered by Hemingway**

Hemingway also testified about his arrest on April 12, 2004. According to his testimony, on that date, Hemingway was at a friend's house at 185 Lewis Street playing cards. (Tr.B 6). Shortly after 8:00 p.m., Hemingway left the residence with three other people and walked to his car. (Tr.B 7; 21). The car was a green Oldsmobile Aurora with tinted windows. (Tr.B 21). Hemingway started his car, but before he was able to pull away, two police cars stopped nearby, and four officers got out. (Tr.B 23). Hemingway sat in his car and watched as the officers pursued an individual who was walking in the opposite direction. (Tr.B 24). No one

5

was standing next to the driver's side window of the car before the officers arrived, Hemingway asserted. (Tr.B 25). A few minutes later, Hemingway observed the officers walking back with the individual in handcuffs. (Tr.B 25).

After the officers returned, one of them started walking toward Hemingway's vehicle. According to Hemingway, he then turned off the ignition because he had a bottle of liquor in the car and did not want to be arrested for driving while intoxicated. (Tr.B 26). When he turned the car off, the interior lights automatically illuminated. At that point, Hemingway heard someone knocking on the trunk of the car. He looked in the mirror and saw an officer with a gun who instructed him to "step out of the vehicle." Hemingway asked, "For what?" and the officer opened the door, grabbed his arm and repeated, "Get out of the vehicle." (Tr.B 26-27). Once Hemingway exited the car, the officer turned him around so that he was facing the car and conducted a search of his person. (Tr.B 28-29). As he searched, the officer asked Hemingway whether he was carrying any weapons or sharp objects. Hemingway indicated that he was not, and the officer asked whether he possessed any drugs. Hemingway again stated, "no." The officer continued by asking whether Hemingway had ever been arrested, to which he replied that he had. "For what," the officer asked, and Hemingway responded, "drugs, in the past." At the conclusion of this exchange, the officer handcuffed Hemingway, placed him in the back seat of a police car and stated, "I'm going to run a search on you and see if you have a warrant." (Tr.B 29-30). Hemingway testified that he did not consent either to a search of his person or of his vehicle. (Tr.B 30; 32). He further stated that although he had marijuana, he did not possess cocaine at the time of the search. (Tr.B 60).

**DISCUSSION**

Hemingway moves to suppress evidence taken from him on April 12, 2004, on the grounds that such evidence was obtained in violation of his constitutional rights. (Docket # 88). Resolution of this claim requires the Court to analyze the interaction between Hemingway and the officers and determine whether it amounted to a seizure within the meaning of the Constitution. To implicate the Fourth Amendment, the interaction must have amounted to either an investigative detention or an arrest; a consensual encounter, by contrast, would not trigger the protections of the Amendment. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).

The most intrusive of these three interactions, arrest, requires a showing of probable cause. For a warrantless arrest to be valid under the Fourth Amendment, the arresting officers must have probable cause to make the arrest at the time it is made. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "[I]n general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citations omitted). "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, . . . but must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" *Id.* (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)); *see Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

The second possible level of interaction between law enforcement and private citizens is an investigative detention, often referred to as a *Terry* or traffic stop. A *Terry* stop

constitutes a more limited seizure than an arrest within the meaning of the Fourth Amendment and thus requires a more modest showing by the government than that required to justify an arrest. *United States v. Terry*, 392 U.S. 1, 30 (1968); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994). Instead of probable cause, a *Terry* stop must be justified by "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d at 781 (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry v. Ohio*, 392 U.S. at 30 (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"). An officer conducting a *Terry* stop is permitted to detain the individual briefly "in order to investigate the circumstances that provoke[d] suspicion." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). During the stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* The detainee is not required to respond, however, and must thereafter be released unless his or her answers provide the officer with probable cause for an arrest. *Id.* Evidence obtained as the result of an unjustified *Terry* stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed. *Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. at 488.

The final and least intrusive type of interaction between law enforcement and private citizens is the consensual encounter. A consensual encounter requires no justification –

either by probable cause or reasonable suspicion – because the citizen is not seized, and thus no constitutional rights are implicated. *See United States v. Adegbite*, 846 F.2d 834, 837 (2d Cir. 1988) ("only if they were seized are defendants vested with any right to constitutional safeguards") (quoting *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988)). As the Supreme Court has recognized, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Terry*, 392 U.S. at 19 n.16.

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant in fact subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996). Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *United States v. Bayless*, 921 F. Supp at 213, that the search or seizure did not violate the Fourth Amendment. *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

In analyzing whether a seizure has occurred, the Court must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers'

requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see also Brendlin v. California*, No. 06-8120, slip op. at 4-5 (June 18, 2007); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991). According to the Second Circuit, those circumstances include the following factors, the presence of which suggest that a seizure has occurred:

> [T]he threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*United States v. Hooper*, 935 F.2d 484, 491 (2d Cir. 1991) (citations omitted). During a consensual encounter, law enforcement is not required to advise the citizen that he or she is free to leave or terminate the questioning. *See id.* at 492.

In this case, I find that the credible testimony shows that the following occurred on April 12, 2004.[6] At approximately 8:19 p.m., a unit comprised of four police cars was on patrol in the area of Lewis Street, an area known to have a high incidence of narcotics activity. (Tr.A 9-10; 35). Several of the officers observed a man leaning into an Oldsmobile Aurora that was parked on Lewis Street; one of the officers, Officer Ferro, saw that the man had his head and his right arm inside the car. (Tr.A 14; 36-37). As the police approached, the man looked up and in their direction, immediately withdrew his arm from the car and began to walk "quickly" away from the car in the opposite direction from the officers. (Tr.A 15). As he did so, Officer Ferro observed him put his right hand, which appeared to be holding something, into the pocket of his

---

[6] Having observed the demeanor of the witnesses and considered their testimony and interest in the case, I find that officers' testimony to be more credible than that offered by the defendant.

sweatshirt. (Tr.A 24-25; 28-29). During a pat-search of him, officers observed a bag containing over forty smaller baggies of suspected cocaine fall out of his sweatshirt pocket as he complied with Officer Ferro's direction to stand up straight. (Tr.A 17; 25).

While those events were taking place, Officer Romano approached the Aurora and asked the driver for identification, which identified the driver as Joey Hemingway. Romano asked him where he was coming from, where he was going and what he was doing. During that questioning, Romano heard Ferro's announcement of the cocaine discovery from the individual who had been observed leaning into Hemingway's vehicle. (Tr.A 37-40). At that point, Romano asked Hemingway to exit his car, which he did. (Tr.A 40). Romano further inquired of Hemingway whether he had any weapons or narcotics, and Hemingway responded that he did not and told Romano to "check" him. (Tr.A 41). Romano then searched him and discovered two small packages of cocaine in the change pocket of his jeans. (Tr.A 42).

The record as it was developed during the hearing strongly suggests that the initial encounter between Romano and Hemingway – that is, their interaction up to the point that Romano asked Hemingway to exit the car – was a consensual encounter.[7] While the record is not entirely clear, it appears that Romano, accompanied by Officer Alberto, approached Hemingway's car. At the time of the approach, the car was parked at the curb of the street with the ignition off. There is no evidence that the officers activated their sirens or lights or surrounded Hemingway's car either on foot or in their vehicles in order to impede or block his

---

[7] Although it is a closer question, I conclude in the alternative that even if the initial interaction were deemed a *Terry* stop, reasonable suspicion supported the officers' actions. At the time that Romano began speaking with Hemingway, another individual had been observed engaging in what appeared to be a hand-to-hand transaction with someone in the Aurora, which was parked in an area known for its high incidence of narcotics activity. When that individual saw the police, he immediately departed, walking away hastily, while at the same time placing an object that was in his right hand into his pocket.

egress. Romano did not physically touch Hemingway, display his weapon or speak in a manner that would compel a reasonable person to answer or to feel he was not free to leave. Rather, he simply asked to see Hemingway's identification and asked him general questions about what he was doing. *See United States v. Hooper*, 935 F.2d at 491. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . .; [and] ask to examine the individual's identification." *Florida v. Bostick*, 501 U.S. at 439 (citations omitted); *accord United States v. Springer*, 946 F.2d at 1016. *See also United States v. Montilla*, 928 F.2d 583, 585, 590 (2d Cir. 1991) (encounter properly characterized as consensual if district court, on remand, credits government witness's testimony that two officers approached individuals in bus terminal, asked for identification, inquired about their journey and requested permission to inspect their luggage for narcotics); *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (encounter was consensual where two police officers approached the defendant in the airport, asked him to move out of the way of pedestrian traffic, to produce identification and his plane ticket and posed several questions about his travels).

I further determine that the consensual encounter evolved into a *Terry* stop at the point at which Romano asked Hemingway to exit his car, which occurred after Romano heard Ferro announce that cocaine had been discovered on Walker. Hemingway complied. I find his acquiescence to amount to an act of submission to a show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (a Fourth Amendment seizure occurs when a subject submits to a show of authority); *United States v. Swindle*, 407 F.3d 562, 573 (2d Cir. 2005) (no seizure occurs without "submission to the assertion of authority"). I easily conclude, however, that by the time Romano learned of the cocaine discovery, ample reasonable suspicion existed to

detain Hemingway briefly for further investigation.[8] *See* note 7 *supra*. Requiring Hemingway to exit his car and asking him whether he had weapons or narcotics were consistent with the officers' legitimate investigative purposes, as well as their reasonable concerns for their own safety. *See Berkemer v. McCarty*, 468 U.S. at 439 (*Terry* stops are non-custodial and are not subject to the strictures of *Miranda*; questioning during a *Terry* stop must be "reasonably related in scope to the justification for their initiation") (quoting *United States v. Brignoni-Ponce*, 422 U.S. at 881)); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (requiring a driver to exit his vehicle during a traffic stop is a *de minimis* intrusion when balanced against the concern for officer safety).

Having determined that Romano's actions were proper to that point, the final inquiry is whether he was justified in conducting a full-blown, rather than a pat-down, search of Hemingway. Hemingway argues that the full search exceeded the parameters of a weapons pat-down, the search authorized under *Terry*. The government, by contrast, argues that the search was authorized, not by *Terry*, but by Hemingway's voluntary consent. I agree with the government.[9]

---

[8] Hemingway relies on Second Circuit authority for the proposition that reasonable suspicion for a traffic stop cannot be based solely upon the defendant's proximity to a location or individual known for narcotics activity. *See United States v. Swindle*, 407 F.3d at 569 (finding that defendant's entry into a known drug house was insufficient to establish probable cause); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"). These cases, although authority for the proposition cited, are nonetheless inapposite because they involved *Terry* stops in which the defendant's proximity to locations or individuals known for narcotics activity was the sole basis for the officers' suspicions. In this matter, the officers stopped Hemingway, not only because he was in an area known for narcotics trafficking, but because they had observed what they believed was a narcotics transaction between Walker and the individuals in the car Hemingway was driving and discovered narcotics on Walker's person. These observations reasonably raised the officers' suspicions to a degree justifying further investigation.

[9] For this reason, I find that defendant's reliance on *Minnesota v. Dickerson*, 508 U.S. 366 (1993), is
(continued...)

Although the Fourth Amendment generally requires that a police officer obtain a warrant before conducting a search of a person or private property, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)), a warrantless search is permissible if based upon voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996). The consent need only be voluntary, that is, obtained without coercion, and the individual need not be advised of his or her right not to consent. *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). It is the government's burden to prove by a preponderance of the evidence that the consent was voluntary, *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981) – an issue that must be determined by an objective standard, *United States v. Garcia*, 56 F.3d at 423, and judged on the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990).

Although Hemingway argues that he only offered to allow Romano to "check" him because he knew Romano intended to search him anyway, he offers no factual support for his purported belief. Hemingway has presented no evidence suggesting that Romano would have exceeded the bounds of a permissible pat-down for weapons had Hemingway not consented to

---

[9](...continued)
misplaced. (Docket # 122 at 23-24). There, the suppression of narcotics seized during a search was warranted because they were discovered only after the officer had determined that the defendant did not have a weapon; once that determination had been made, the continued search exceeded the permissible bounds of a *Terry*-authorized weapon pat-down. *Id*. at 378. Unlike this case, there was no issue of consent in *Dickerson*. Here, had Hemingway not told the officers to "check" him, *Dickerson* would indeed mandate suppression. Because I find that Hemingway did in fact invite or consent to the search, *Dickerson* is inapposite.

the search.  In any event, regardless of Romano's intention at the time he inquired about weapons and drugs, nothing in the record before this Court suggests that Romano's actions or statements coerced Hemingway's consent.  Accordingly, because Romano had Hemingway's consent to perform a search for both narcotics and weapons, no further justification was necessary.[10]  It is therefore my recommendation that Hemingway's motion to suppress evidence seized from him on April 12, 2004 be denied.

## CONCLUSION

For the foregoing reasons, it is my recommendation that Hemingway's motion to suppress evidence seized on April 12, 2004 **(Docket # 88)** be **DENIED**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
June   20  , 2007

---

[10]  Hemingway also contends that to the extent he consented to the search of his person, such consent was tainted by the illegal *Terry* stop.  (Docket # 122).  Because I find that the government has sufficiently demonstrated that Hemingway's encounter with the officers was lawful, it is my further recommendation that his motion to suppress on this basis be denied.

Although Hemingway does not appear to directly challenge the subsequent seizure of narcotics discovered in his hands following his arrest, a "fruit of the poisonous tree" argument premised on an illegal *Terry* stop would be similarly unavailing.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[11]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                           *s/Marian W. Payson*
                                              MARIAN W. PAYSON
                                     United States Magistrate Judge

Dated: Rochester, New York
       June   20  , 2007

---

[11] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).